**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Jane and John Doe, Respondents,

v.

Nikki Gardner, Jeremy Gardner, and SCDSS, Defendants,

Of whom Jeremy Gardner is the Appellant.

In the interest of a minor under the age of eighteen.

Appellate Case No. 2020-000254

———————————

Appeal From Pickens County
Karen S. Roper, Family Court Judge

———————————

Unpublished Opinion No. 2021-UP-192
Heard May 4, 2021 – Filed June 2, 2021

———————————

**REVERSED AND REMANDED**

———————————

John Brandt Rucker and Allyson Sue Rucker, both of The Rucker Law Firm, LLC, of Greenville, for Appellant.

Vanessa Hartman Kormylo, of Vanessa Hartman Kormylo, P.A., of Greenville, for Respondents.

Karen G. Pruitt, of Karen G. Pruitt, Attorney at Law, of Pickens, as Guardian ad Litem.

_____

**PER CURIAM:**  Jeremy Gardner (Father) appeals an order terminating his parental rights to Child.  On appeal, Father argues the family court erred in finding (1) his home could not be made safe due to severe or repetitious harm, (2) he was unable to provide minimally acceptable care for Child based on a diagnosable condition unlikely to change in a reasonable time, and (3) termination of parental rights (TPR) was in Child's best interest.  We reverse and remand.

Father and his wife Nikki Gardner (Mother; collectively, Parents) have a history of drug addiction and involvement with the Department of Social Services (DSS).  In March of 2014, the family court removed Mother's oldest two children from Parents after Mother tested positive for opiates when she was thirty-four weeks pregnant.  These two oldest children were placed in the custody of alternate caregivers, where they remain.

In August of 2014, Mother gave birth to a child (Sibling 1) who tested positive for methamphetamine.  Sibling 1 was removed from Parents, and Parents were ordered to complete placement plans.  Parents did not complete their placement plans.  In 2016, the family court terminated Parents' parental rights to Sibling 1, and the Does adopted her.

In 2016, Mother gave birth to another child (Sibling 2), who suffered withdrawal symptoms from drugs at birth.  The family court removed Sibling 2 from Parents and relieved DSS of providing reunification services.  The court later terminated Parents' parental rights to Sibling 2, and the Does adopted him.

In October 2018, Child was removed from Parents at birth after suffering "withdrawal symptoms from being exposed to Subutex while in utero."[1]  DSS placed Child with the Does in November 2018, and the Does filed this private action for TPR and adoption on November 29, 2018.

On December 12, 2018, the family court held a merits removal hearing for Child's case.  In its February 5, 2019 order, the family court ordered Parents to complete a placement plan that included submitting to drug abuse assessments and following recommendations, maintaining stable and suitable housing, completing parenting

_____

[1] Subutex is a prescription medicine that treats opiate withdrawal symptoms.

classes, submitting to mental health assessments and following recommendations, and participating in couples counseling.

On July 10, 2019, the family court held a permanency planning hearing. In its September 5, 2019 order, the family court found Father was "engaged in [an] Intensive Outpatient Program" (IOP) at Behavioral Health Services (BHS) and would complete the program in a couple of weeks. The court also found Mother "completed all requirements [from the drug assessment] beyond the medication assisted treatment and associated counseling." Finally, the court found Parents completed parenting classes and mental health assessments, which determined they did not need further services. At the time of the July 2019 permanency planning hearing, DSS recommended reunification. However, before the permanency planning order was filed, Child tested positive for methamphetamine after an unsupervised visit with Parents.

On October 7 and 8 and December 19, 2019, the family court held this TPR hearing. Father testified he began an IOP at BHS on December 4, 2018; he initially went three times per week for three hours each time, then tapered to twice a week for two hours each time, and finally to once a week for ninety minutes each time. He testified he completed IOP but continued to attend peer support. Father acknowledged BHS prescribed him Suboxone[2] to manage his opiate addiction.

Michael Crouch, a peer support and substance abuse specialist at BHS, stated he began treating Father when Father began the third phase of IOP, and Crouch provided Father ongoing individual peer support after Father completed IOP. Crouch, who also treated Mother, believed Parents changed their behaviors. Likewise, Angela Nicholson, the director of medical services at BHS, testified Father completed Phase 3 of IOP, which could not be completed unless he was testing negative for drugs. She opined Father was "in full remission from his amphetamine stimulant use." Madison McNeely, a DSS caseworker, testified Parents completed their placement plans in Child's case and maintained sobriety. She testified Parents did everything DSS asked of them, and DSS believed reunification would be safe for Child.

Due to Parents' compliance with treatment and the placement plan, the family court ordered transitional visitation on July 10, 2019, with the intent of transferring custody of Child to Parents on August 30, 2019. However, before reunification occurred, Jane Doe (Jane) took Child for a drug test on August 19, 2019; the

---

[2] Suboxone is a prescription medicine used to treat opiate addiction.

results, which were returned on August 26, indicated Child was positive for methamphetamine.  On August 28, 2019, DSS took Child for another drug screen, and Child tested negative for drugs.  Additionally, Parents and Father's grandmother—who lived with them—all tested negative for drugs shortly after Child's positive test.[3]  Parents denied exposing Child to methamphetamine and did not believe she was exposed in their home.

John-Michael Pritchett, a medical assistant at ARCpoint Labs in Greenville, testified he collected Child's hair on August 19, 2019, for a ten-panel "ChildGuard" drug exposure screen.  Pritchett confirmed Jane's identity with photo identification but did not have a way to confirm Child's identity.  He admitted Jane's aunt, Leslie Simpkins, was the business operations manager at ARCpoint and was working that day; Simpkins informed Pritchett that Jane was bringing Child in and she would not be involved in collecting Child's hair sample.  Pritchett testified he sealed Child's hair in an envelope with tamper tape and sent it along with a chain of custody form to the lab for testing.  He stated the hair sample did not leave his possession before he mailed it, he did not tamper with it, and Simpkins was not involved in collecting it.  Pritchett stated the drug testing lab rejected this sample due to insufficient quantity, which happened frequently with this lab.  However, as was his routine practice, he emailed the lab and asked them to proceed with testing.  He stated the sample was positive for methamphetamine.

Simpkins, the business operations manager of ARCpoint Labs in Greenville and Anderson, testified she was Jane's aunt.  She stated Jane was concerned because she thought she smelled marijuana on Child after a transitional visit, so Simpkins suggested she bring Child in for a drug test.  Simpkins acknowledged ARCpoint also had a lab in Spartanburg, where Jane lived, but Simpkins did not work there.  Simpkins testified she told Pritchett that Jane "was coming in with the baby and [Simpkins] could not . . . have any part of it."  Simpkins denied being involved with the collection of Child's hair or tampering with the sample.  She stated they requested a ChildGuard test, which would detect whether Child had "been in a room where someone" had smoked marijuana, methamphetamine, or another drug.  However, Simpkins lacked the expertise to explain how a ChildGuard test worked, the difference between that test and the other tests, or why Child tested positive on this test but negative on a test DSS requested nine days later.  She acknowledged the lab results included the comment "Re-accession" under "Sample comment," but she did not know what that meant or recall seeing that on a result before.

---

[3] Parents submitted to drug screens at DSS's request on August 26, 2019—the same day DSS learned of Child's positive drug test.

Jane stated Child began unsupervised visits with Parents on June 12, 2019, and she did not have any "real concerns" until overnight visits began on August 8. Jane explained, "There was one time that she returned, I did feel like her clothes had a strong odor, and I couldn't place it, whether it was smoke or marijuana, but that was very concerning." Jane recalled noticing Child "tongue thrusting" when she was weaning from methadone and testified she was told that was common in babies who were born addicted to drugs. She asserted she noticed Child similarly tongue thrusting after an August 19 overnight visit. Jane stated she spoke to Simpkins about her concerns and decided to have Child screened for drug exposure. She acknowledged ARCpoint had a lab in Spartanburg that was eleven minutes from where she was, whereas the lab she drove to was twenty-five minutes away. Jane stated Pritchett collected Child's hair sample, and she denied interfering with the collection or tampering with the sample in any way. Jane admitted she did not inform DSS of her concerns that Child had been exposed to drugs or that she had taken Child for a drug test until after she received the results, although she notified DSS about other frequent concerns. She denied exposing Child to methamphetamine and testified she was surprised Child tested positive. Jane stated everyone in her family submitted to drug tests, and the results were all negative. She acknowledged reunification was scheduled to occur four or five days after she received the results from Child's positive drug screen, and she filed a motion to stop reunification. Jane also acknowledged Simpkins, her aunt, signed an affidavit attesting she was the records custodian for ARCpoint in Spartanburg.

Karen Pruitt, the guardian ad litem, testified Parents had "made tremendous progress," "done a remarkable job of beating their addiction," and done everything DSS asked within DSS's timeframe. However, Pruitt was concerned that Parents "had ten years of serious, serious drug use" and recovery was "a life-long event." She was also concerned about Parents' use of Suboxone, which she viewed as "changing one opiate for another." Regarding Child's positive drug screen, Pruitt posited Child could have been exposed to something contaminated, such as fabric, in Parents' home. Pruitt stated Child was tested for drugs again nine days later, and the results were negative. Pruitt testified Parents' home "was immaculate" and "very appropriate." She stated Parents provided material support during visits, including "numerous outfits, toys, food for [Child] to eat while there and food to send back to the" Does, and diapers.

In its final order, the family court found clear and convincing evidence showed (1) Parents' home was unlikely to be made safe within twelve months due to severe or repetitious harm and (2) Parents had diagnosable conditions of drug addiction that

were unlikely to change within a reasonable time.  The court also found TPR was in Child's best interest.  This appeal followed.

On appeal from the family court, this court reviews factual and legal issues de novo.  *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011); *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011).  Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony.  *Lewis*, 392 S.C. at 385, 709 S.E.2d at 651-52.

The family court may order TPR upon finding a statutory ground for TPR is met and TPR is in the child's best interest.  S.C. Code Ann. § 63-7-2570 (Supp. 2020).  The grounds for TPR must be proved by clear and convincing evidence.  *S.C. Dep't of Soc. Servs. v. Parker*, 336 S.C. 248, 254, 519 S.E.2d 351, 354 (Ct. App. 1999).  A statutory ground for TPR exists when "[t]he child or another child while residing in the parent's domicile has been harmed . . . , and because of the severity or repetition of the abuse or neglect, it is not reasonably likely that the home can be made safe within twelve months."  § 63-7-2570(1).  Another statutory ground for TPR exists when "the parent has a diagnosable condition unlikely to change within a reasonable time including, but not limited to, addiction to alcohol or illegal drugs or prescription medication abuse; and . . . the condition makes the parent unlikely to provide minimally acceptable care of the child."  § 63-7-2570(6)(a).

We find the Does failed to submit clear and convincing evidence to support either statutory ground for TPR.  Admittedly, Father has a significant history of opiate and drug addiction, and multiple children—including Child—were harmed by his drug use.  *See* § 63-7-2570(1).  Additionally, Nicholson, who was qualified as an expert in addictions counseling, testified Father had a diagnosable condition of opiate use disorder, which is a lifelong condition.  Further, the Does correctly assert that due to Father's prior failure to attend and complete drug treatment in prior cases, there is a rebuttable presumption that his diagnosable condition is unlikely to change.  *See* § 63-7-2570(6)(b) ("It is presumed that the parent's condition is unlikely to change within a reasonable time upon proof that the parent has been required by [DSS] or the family court to participate in a treatment program for alcohol or drug addiction, and the parent has failed two or more times to complete the program successfully or has refused at two or more separate meetings with [DSS] to participate in a treatment program.").

However, based on evidence that Father complied with drug treatment and cooperated with DSS in Child's case, we find clear and convincing evidence does not support either ground. Both of these statutory grounds have prospective application. Specifically, section 63-7-2570(1) requires a finding—by clear and convincing evidence—that it was not reasonably likely Father's home could be made safe within twelve months. Likewise, section 63-7-2570(6)(a) requires a finding—also by clear and convincing evidence—that Father's diagnosable condition was unlikely to change within a reasonable time. Although Father's history of opiate and drug addiction was clearly and convincingly established, the evidence presented at the time of the TPR hearing showed he had maintained sobriety and complied with treatment such that we cannot say by clear and convincing evidence it was not reasonably likely his home could be made safe within twelve months. *See* § 63-7-2570(1). Likewise, we find Father rebutted the presumption that his diagnosable condition was unlikely to change within a reasonable time. Specifically, Crouch averred Father made long-lasting "internal and external change." He believed Parents' church, which had "several members in long-term recovery," was an effective support group for their recovery. Crouch maintained Parents "put a tremendous amount of effort into their recovery" and changed their behaviors. Nicholson also testified Father completed Phase 3 of IOP, which could not be completed unless a person was testing negative for drugs. She opined Father was "in full remission from his amphetamine stimulant use" and would be "in sustained full remission"—which occurs once a person has been in remission for a year—at the end of December 2019. Nicholson was not aware of anything that would cause Parents to present a risk to Child and did not have any concerns about their ability to parent.

Based on the evidence in the record, Father last tested positive for unprescribed drugs in February 2019, the same month the family court issued an order requiring him to complete a placement plan in Child's case.[4] Thereafter, Father successfully completed IOP, continued attending peer support counseling, and did not have any positive drug tests. After Child's positive drug test, Father submitted to drug screens at DSS's request on August 26, November 6, and December 10, 2019, and all of the results were negative. McNeely testified Father completed his placement

---

[4] Father acknowledged testing positive for opiates in March, April, May, June, July, and August of 2019, but he testified his doctor prescribed him oxycodone for a congenital back defect. Father stated he began taking Suboxone in July 2019 because he wanted to stop taking oxycodone. He acknowledged testing positive for oxycodone in July and August 2019 but asserted he continued taking the oxycodone he was prescribed until he used it all.

plan, made behavioral changes, and maintained sobriety. She stated Parents never refused to submit to a drug screen she requested and did everything DSS asked of them, and DSS believed reunification would be safe for Child. Pruitt testified Parents had "made tremendous progress in the last year," "done a remarkable job of beating their addiction," and "done everything that DSS ha[d] asked them to do" within DSS's timeframe. Based on the foregoing, we find the Does did not present clear and convincing evidence showing it was not reasonably likely Father's home could be made safe in twelve months. We also find the foregoing rebutted the presumption that Father's diagnosable condition was unlikely to change within a reasonable time.

The Does primarily rely on Child's positive drug screen to support their grounds for TPR. Although we are very concerned about this positive drug test, based on the circumstances surrounding it, we are not clearly and convincingly persuaded that this test showed Parents exposed Child to drugs or continued to use drugs. Specifically, Jane took Child to the lab where her aunt worked rather than a lab that was closer to her home, the testing facility initially indicated it did not have a sufficient quantity of hair to conduct a test, and the lab result commented the sample had been "Re-access[ed]." Critically, Child tested negative for drugs nine days later in a drug screen requested by DSS, and everyone in both homes tested negative for drugs. We acknowledge Pritchett and Simpkins testified Simpkins was not involved in the collection of this sample and neither of them tampered with the sample. However, based on unanswered questions about how a ChildGuard test works, the fact Child tested negative for drugs nine days later, and the fact Parents tested negative for drugs in September, November, and December 2019, this positive drug test does not constitute clear and convincing evidence that Parents exposed Child to methamphetamine or continued to use drugs.

We acknowledge the Does' concern about Father's use of Suboxone to manage his opiate addiction. While we share this concern, the expert testimony presented at the hearing was Father's use of Suboxone would not affect his ability to parent Child. Nicholson, who was qualified as an expert in addictions counseling, testified Suboxone does not make a person high, and a person taking Suboxone can work and parent children. She explained Suboxone was FDA-approved for opiate use disorder, and it reduced cravings, stopped withdrawals, and reduced the risk of relapse. Nicholson testified Suboxone was a "partial agonist," meaning it "help[ed] cover those receptors in the brain that are . . . there for opiates, but [did] not give [someone] the same euphoric feeling . . . [or] the same high as [as] an opiate." She averred Suboxone was different than methadone because methadone was "a full agonist," which could make a person high. Nicholson testified Suboxone was

approved for long-term use, and people using Suboxone long-term were able to keep jobs and be involved with their families. Critically, although BHS prescribed Parents Suboxone, Nicholson stated she was not aware of anything that would cause Parents to present a risk to Child, and she did not have any concerns about their ability to parent. Although Pruitt posited Parents were "changing one opiate for another," the Does did not offer any expert testimony to counter Nicholson's testimony that Suboxone does not make a person high, and a person can work and parent while on Suboxone. While our standard of review is de novo, we are constrained by the evidence in the record. Because the only expert testimony presented showed Suboxone would not affect Father's ability to parent Child, we cannot find by clear and convincing evidence that Father's ongoing use of Suboxone made him unlikely to provide a safe home for Child, or his diagnosable condition of opiate addiction made him unlikely to provide minimally adequate care for Child.

Finally, the Does did not submit sufficient evidence to support their claim that Parents were not adequately treated for methamphetamine or DSS's placement plan was insufficient. The Does primarily complain that Parents were not seeing a licensed counselor—which the Does aver means Parents did not treat their methamphetamine addiction. However, Crouch testified, "[A]nybody in our program is going to see a clinical counselor at different times throughout the month," and Father saw "an individual counselor at least once a month." The Does did not present expert testimony asserting BHS's treatment was inadequate. Without expert testimony indicating BHS's treatment was insufficient, this court cannot rely on the Does' assertions to find the treatment was inadequate.

Based on the foregoing, we reverse the termination of Father's parental rights and remand for a permanency planning hearing pursuant to section 63-7-1700 of the South Carolina Code.[5] We are mindful Parents have both experienced significant drug abuse issues that have affected Child's life and their own lives. However, at the time of this trial to terminate their parental rights, they had put together enough of a recovery to avoid failure by a clear and convincing standard. The learned trial judge was there to judge the credibility of the witnesses and Parents' commitment to a sober lifestyle that puts Child first. It is our hope that she will revisit the

---

[5] Because our finding that the Does failed to prove a statutory ground for TPR is dispositive, we decline to address Father's argument regarding Child's best interest. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing an appellate court does not need to address remaining issues when prior issue is dispositive).

totality of the circumstances that have occurred since the trial in a permanency planning hearing.[6]  A permanency planning hearing will allow all parties and Child's guardian ad litem an opportunity to update the family court on what has occurred since the TPR hearing.  We urge the family court to conduct a hearing as expeditiously as possible, including presentation of a new guardian ad litem report and an updated home evaluation.

**REVERSED AND REMANDED.**

**KONDUROS, GEATHERS, and MCDONALD, JJ., concur.**

---

[6] Shortly before oral argument, the Does moved to supplement the record on appeal.  Because this supplemental information was not presented to the family court, the Appellate Court Rules do not permit us to consider it now.  *See* Rule 210(c), SCACR ("The Record shall not, however, include matter which was not presented to the lower court or tribunal."); Rule 210(h), SCACR ("Except as provided by Rule 212 and Rule 208(b)(1)(C) and (2), the appellate court will not consider any fact which does not appear in the Record on Appeal.").  However, at the permanency planning hearing on remand, the family court will have the opportunity to consider this additional evidence as it may impact the consideration of whether Parents have overcome their drug addictions such that their home may be made safe for Child.  *See, e.g.*, *DSS v. Cochran*, 356 S.C. 413, 419, 589 S.E.2d 753, 756 (2003) (reversing and remanding TPR due to erroneous admission of mother's blood sample "with leave to open the record to receive any other evidence pertinent to a determination as to whether mother has overcome her drug addiction and to give DSS the opportunity to present a proper chain of custody for mother's blood samples").